## Nicklaus Cos., LLC v GBI Invs., Inc.

2025 NY Slip Op 30947(U)

March 24, 2025

Supreme Court, New York County

Docket Number: Index No. 656284/2022

Judge: Joel M. Cohen

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 03M

-----------------------------------------------------------------------------------X

NICKLAUS COMPANIES, LLC,

|                                   |                                        |
|-----------------------------------|----------------------------------------|
| Plaintiff,                        | **INDEX NO.** 656284/2022              |
| - v -                             | **MOTION DATE** 05/01/2024, 05/07/2024 |
| GBI INVESTORS, INC., JACK W. NICKLAUS, | **MOTION SEQ. NO.** 010 011       |
| Defendants.                       | **DECISION + ORDER ON MOTION**         |

-----------------------------------------------------------------------------------X

HON. JOEL M. COHEN:

The following e-filed documents, listed by NYSCEF document number (Motion 010) 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 459, 460, 461, 504, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 576, 577, 579, 580, 581, 582, 583, 584, 589

were read on this motion for                SUMMARY JUDGMENT                .

The following e-filed documents, listed by NYSCEF document number (Motion 011) 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 505, 511, 512, 513, 514, 578, 590

were read on this motion for                SUMMARY JUDGMENT                .

This case involves the seemingly unlikely dispute between Jack W. Nicklaus (renowned professional golfer) and Nicklaus Companies, LLC, the company he helped create in 2007 and led for many years.  The principal issue is whether, in the wake of Mr. Nicklaus's resignation from the company and his subsequent relinquishment of his financial and management interests in the company, the company nevertheless still controls the commercial rights to his name, image and likeness and can prevent him from competing against the company in certain businesses.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
Motion No.  010 011

**Page 1 of 35**

1 of 35

Early in the case, the Court issued a preliminary injunction that steered a middle course between the parties' positions (NYSCEF 247). The legal relationship between the parties was (and is) complicated by the fact that they documented their 2007 transaction in multiple contemporaneous agreements (with differing signatories, governed by different state laws, with differing forum selection provisions) covering sometimes overlapping subjects, including with respect to Mr. Nicklaus's ability to pursue business activities on his own. Based on a limited evidentiary record, the Court ordered that pending the resolution of this action Mr. Nicklaus was not bound by the parties' broad Non-Competition Agreement (which likely had expired), but remained subject to and limited by a Purchase and Sale Agreement under which it appeared the company had acquired certain exclusive rights with respect to Mr. Nicklaus and his business. The Court made clear, however, that these conclusions were preliminary and could be revisited based on additional evidence available – after the conclusion of discovery—on summary judgment or at trial (NYSCEF 246 ["11.22 Tr."] at 340-352; NYSCEF 346 at 8 [denying motion to reconsider]). We have now reached that stage.

Nicklaus Companies, LLC ("Plaintiff" or the "Company") moves for partial summary judgment on the Third and Sixth causes of action asserted against Mr. Nicklaus and his wholly owned company GBI Investors, Inc. ("GBI") (together, "Defendants") in the Second Amended Complaint for breach of contract (Mot. Seq. 011). For their part, Defendants move for Summary Judgment on *all* claims asserted against them in the Second Amended Complaint (Mot. Seq. 010).

For the reasons discussed in greater detail below, Defendants' motion is granted and the Company's complaint is dismissed. In summary: Rather than obtaining a broad grant of rights from Mr. Nicklaus himself via the PSA, to which Mr. Nicklaus was not a party, the Company

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
   **Motion No.  010 011**

**Page 2 of 35**

2 of 35

instead obtained a broad grant of rights *from GBI*. While the PSA contains language indicating such a grant of rights from GBI would be sufficient to operate the business, and there is evidence that Mr. Nicklaus had in the past referenced GBI as an "exclusive" vehicle for licensing purposes, no evidence has been submitted to indicate that Mr. Nicklaus ever imbued GBI with the authority to convey rights to his name, image and likeness that would be exclusive *even as against Mr. Nicklaus himself*. Instead, reading the full set of contemporaneous agreements together as a whole, and now that discovery has presumably uncovered all relevant documentation regarding GBI's authority with respect to Mr. Nicklaus, the unmistakable conclusion is that the principal limitations on Mr. Nicklaus *personally* with respect to the Company are set forth in his Employment Agreement and in the Non-Competition Agreement. As discussed below, the restraints imposed on Mr. Nicklaus by those agreements have expired by virtue of his resignation from and relinquishment of membership interest in the Company and its management. Accordingly, the Court finds that Mr. Nicklaus is free of restraints to pursue his own business interests as he sees fit, subject only to respecting the Company's exclusive rights to use specific trademarks that were assigned to it in the PSA.

## BACKGROUND

Mr. Nicklaus is an iconic sports figure, with accomplishments as a professional golfer too numerous to adequately summarize in this space. Mr. Nicklaus has also had a successful career as a golf course designer, acting as the principal designer of over 300 golf courses around the world, and his commercial endorsements have substantial value as shown by the vigor with which both sides in this case seek to control commercial rights with respect to his name, image and likeness.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 3 of 35**

3 of 35

Prior to 2007, Mr. Nicklaus conducted his golf course design and commercial endorsements businesses principally through GBI and its subsidiaries (NYSCEF 464 [Plaintiff's Rule 19a Statement of Undisputed Facts ("PSUF") ¶¶6-12). Mr. Nicklaus has confirmed that his business of providing product endorsements from the mid-1980s through May of 2007 was handled by GBI or related entities and included the licensing of his name, image, and likeness (PSUF ¶ 14; NYSCEF 466 [Tr 9.20.22] at 14:21-15:1).

Despite that arrangement, the evidence shows that Mr. Nicklaus also made paid appearances at golf tournaments and other events outside of his employment with GBI, pursuant to agreements in which he would grant third parties such as event promoters the right to use his name, image, and likeness for promotional purposes (NYSCEF 460 [Defendant's Rule 19a Statement of Undisputed Facts ("DSUF") ¶45; NYSCEF 448 [Plaintiff's Response to RFA] No. 7).

Prior to the creation of the Company, Mr. Nicklaus and/or GBI entered into various agreements relating to Mr. Nicklaus' publicity rights, including a September 1992 Trademark License (NYSCEF 473), 1994 Consent (NYSCEF 474), 1996 Trademark License (NYSCEF 475), 1996 Golden Bear Golf Resolution (NYSCEF 476), 1996 SEC Registration Statement (NYSCEF 477), and 1996 SEC Amendment and Attached Agreements (NYSCEF 479). As discussed below, none of those agreements transferred Mr. Nicklaus's individual publicity rights outright to GBI or granted GBI licenses to such rights that were unambiguously exclusive as against Mr. Nicklaus himself.

In 2007, Mr. Nicklaus decided to sell GBI and other assets in a transaction with Howard P. Milstein, a real estate and banking executive, for $145 million (DSUF ¶47). As part of the transaction, the Company was formed to carry on GBI's businesses (DSUF ¶48).

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 4 of 35**

4 of 35

[* 4]

As noted above, the parties entered into a number of separate agreements in connection with the transaction (collectively, the "Transaction Agreements"):

### The Purchase and Sale Agreement dated May 25, 2007

The parties to the Purchase and Sale Agreement (NYSCEF 398 ["PSA"]) were the Company, GBI, NF Dynasty, LLC ("NF Dynasty") (a Florida limited liability company controlled by Mr. Nicklaus), and Emigrant GB LLC ("Emigrant GB") (a Delaware limited liability company whose principal place of business is New York).  Under the PSA, which is governed by New York law (*id.* § 12.15), GBI agreed to sell and assign various assets and liabilities to the Company in exchange for $145 million in cash and other consideration, including the issuance of all of the "Class A" equity units of Membership in the Company to GBI and NF Dynasty.

Among the assets that GBI transferred to the Company pursuant to the PSA were "[a]ll of the intangible rights and property of GBI, including all of the publicity and related commercial rights held by GBI to use and/or license the use of the endorsement, name, nickname, likeness, signature and/or other identifying characteristics of Jack W. Nicklaus and biographical information related to his career, all Intellectual Property owned by or licensed to GBI, and all related rights as a licensor of such Intellectual Property . . . , going concern value, goodwill . . . ." (*id.*, Annex A, ¶15).

In Section 4.19 of the PSA, GBI represented and warranted that upon consummation of the purchase and sale, "the Company shall acquire all assets, rights and properties necessary to conduct the Business in substantially the same manner as such business is conducted by GBI and its Subsidiaries immediately prior thereto."  That section further provided that:  "Except as set forth on Schedule 4.19 [excluding certain entities], the GBI Sold Assets and Golf Club Assets

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 5 of 35**

include all assets or interests (other than publicly traded securities) heretofore held by a member of the Nicklaus Family in (i) any entity owned, directly or indirectly, in whole or in part, by GBI or Dynasty LLC or the Transferred Subsidiaries immediately prior to the Closing, (ii) any business conducted by, or asset held by, GBI or Dynasty LLC or the Transferred Subsidiaries immediately prior to the Closing (including the so-called "super deals"), or (iii) to the extent that the interest(s) therein owned by the Nicklaus Family exceed(s) 5% of the voting power or economic interest thereof, any customer of, or any entity that provided services to or that received services from, GBI, Dynasty LLC or the Transferred Subsidiaries."

Section 4.10(a) of the PSA, titled, "Intellectual Property" provided: "It is the intention of the Parties to include in this transaction all Intellectual Property necessary for the Company to continue the Business in all material respects as currently conducted by GBI and its Subsidiaries. Schedule 4.10(a) sets forth a list of all Intellectual Property that is registered with a Governmental Entity, all Internet domain names and all other material Intellectual Property included as part of the GBI Sold Assets. Such list, together with the Intellectual Property licensed to GBI under the Material IP Contracts, includes all material Intellectual Property in which GBI or a Transferred Subsidiary has any right, license or permission to use in any manner in connection with the Business as conducted as of the date hereof, other than the Excluded Intellectual Property (the 'Transferred Intellectual Property')."

Schedule 4.10(a), in turn, references "Annex A" for "internet Domain Names, Copyrights, Trademarks and Patent." Annex A of the PSA lists the "Transferred Assets":

> All of the intangible rights and property of GBI, including all of the publicity and related commercial rights **held by GBI** to use and/or license the use of the endorsement, name, nickname, likeness, signature and/or other identifying characteristics of Jack W. Nicklaus and biographical information related to his career, all Intellectual Property owned by or licensed to GBI, and all related rights

**656284/2022  NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
  **Motion No.  010 011**

**Page 6 of 35**

as a licensor of such Intellectual Property (other than the Excluded Intellectual Property), going concern value, goodwill, telephone, telecopy and e-mail addresses and listings.

(PSA, Annex A ¶ 15 [emphasis added]).  PSA Schedule 4.10(b) provides:

For the avoidance of doubt, the right of Jack W. Nicklaus to utilize his endorsement, name, nickname (the "Golden Bear"), likeness, signature and biographical information to identify himself as a professional golfer and for personal, investment and charitable purposes is not an asset of GBI and continues to be retained by Mr. Nicklaus individually.

(PSA, Schedule 4.10(b)).

In Section 12.1 of the PSA, GBI and NF Dynasty each agreed that for so long as either of them is a member of the Company, and for two years thereafter, they would not compete with the Company or solicit actual or prospective customers of the Company (*id.* §12.1).

Mr. Nicklaus was not a party to the PSA.  Indeed, the agreement provided that "neither the Company nor Investor [Emigrant GB LLC] or its Affiliates, nor any Person claiming by or through any of such Persons, shall have any recourse against Jack W. Nicklaus or any other member of his Immediate Family (as such term is defined in the LLC Agreement), with respect to any claims that directly or indirectly arise from or relate to, in whole or in part, the transactions undertaken by the GBI Entities as contemplated by this Agreement and the Ancillary Agreements, provided however, that the foregoing limitation of recourse shall not preclude the enforcement of any obligations undertaken by any of such persons individually in any Ancillary Agreement or the Guarantees of Collection to which such individual may be a named party." (*id.* §10.7[b]).

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 7 of 35**

***The Amended and Restated Limited Liability Agreement of Nicklaus Companies, LLC, dated May 31, 2007 (the "LLC Agreement")***

Under the LLC Agreement (NYSCEF 400 ["LLC Agreement"]) (entered into by the Company, GBI, Mr. Nicklaus, NF Dynasty and Emigrant GB), the parties agreed that the Company was being formed under Delaware Law for the primary purpose of acquiring and engaging in the businesses that Mr. Nicklaus had formerly conducted through GBI (*id.* §§1.4, 9.17). Pursuant to the LLC Agreement, GBI and Mr. Nicklaus became "Members" (i.e., equity owners) of the Company.

The LLC Agreement provided that the Company does not "have the authority to … use … the Nicklaus IP in any manner without the prior consent of [Mr. Nicklaus], which consent will not be unreasonably withheld and will be deemed given unless a written objection is made within fifteen (15) days of [Mr. Nicklaus's] receipt of a written request for such consent describing the proposed transaction; provided, that for purposes of the foregoing, any use … that [Mr. Nicklaus] determines in good faith could reflect negatively upon the character, honesty, integrity, morality, business acumen, or abilities or otherwise diminish or conflict with the reputation or public image of [Mr. Nicklaus] or any member of his family shall be deemed to provide a reasonable basis to withhold consent." (*id.* § 6.3). Mr. Nicklaus's consent right is tied to his ownership of the single Class C Unit in the Company, which he still retains.

The LLC Agreement defined the Nicklaus IP as including "the name, photograph, likeness, and image of JWN and the JWN-related brands and trademarks now existing or owned by or licensed to the Company in the future, including, but not limited to, Nicklaus, Jack Nicklaus Signature and Golden Bear." (*id.*).

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**          **Page 8 of 35**
**Motion No.  010 011**

8 of 35

*Executive Employment Agreement, dated May 31, 2007*

Mr. Nicklaus entered into an Executive Employment Agreement with the Company dated May 31, 2007 (NYSCEF 403 ["Employment Agreement"]). The Employment Agreement is governed by Florida law and contains a dispute resolution provision mandating arbitration (*id.* §§6.9, 6.11). Among other things, the Employment Agreement barred Mr. Nicklaus from designing golf courses or endorsing products and services outside of the Company during his Employment Term and for five years thereafter (DSUF ¶ 103).

As noted below, an Arbitrator recently determined that the competitive restrictions contained in the Employment Agreement expired on June 1, 2022, five years after Mr. Nicklaus' resignation from the Company (NYSCEF 402).

*The Non-Competition Agreement, dated May 31, 2007*

Under the Non-Competition Agreement (NYSCEF 402), which is governed by Florida law (*id.* §6.1), Mr. Nicklaus and the Company (with GBI signing for the Company) agreed that Mr. Nicklaus would not compete with the Company or solicit its customers "[f]or so long as GBI retains an ownership interest in the Company sufficient to elect at least two (2) members of the Board of Managers, but in no event for a period of less than ten (10) years after the date of the Closing" (*id.* §1). The Non-Competition Agreement provided that during this Restricted Period, Mr. Nicklaus could not "provide [his] personal services as a spokesman or authorize the promotional use of [his] name or likeness for the business, products or services of a Competitor" (*id.* §1; DSUF ¶ 110). Schedule 1 to the Non-Competition Agreement acknowledges and attempts to harmonize the separate competitive restrictions contained in the Employment

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 9 of 35**

9 of 35

Agreement (discussed above), including how its competitive restraints would be circumscribed upon expiration of the Employment Agreement (NYSCEF 403, Schedule 1).

### Subsequent Agreements

The LLC Agreement and the other Transaction Agreements were amended at various times following May 2007, including through an Employment, Governance & Control Agreement dated January 1, 2013 (the "EGC Agreement"). The EGC Agreement was amended in part by an Amendment and Reimbursement Agreement, dated September 23, 2013.

Pursuant to the Transaction Agreements, following May 2007, Mr. Nicklaus conducted business activities through the Company.

### Mr. Nicklaus' Resignation and Aftermath

Over the years, relations between Mr. Nicklaus and Mr. Milstein became strained. On May 3, 2022, Mr. Nicklaus sent a letter to the Company resigning his positions as an officer and Board member of the Company (NYSCEF 443). In Mr. Nicklaus's letter of resignation, he acknowledged that "agreements governing my interests in the [Company] continue to provide … rights and responsibilities." Similarly, in an email dated May 12, 2022, Mr. Nicklaus acknowledged that prior to May 3, 2022, he had made "commitments … for projects and endorsement," and stated that he was "willing to continue to do what is necessary to meet commitments" for those projects and endorsements (NYSCEF 443).

In July 2022, after this lawsuit had begun, Mr. Nicklaus formed a private office maintained by his family for the business, investment and charitable work undertaken by them (the "Nicklaus Family Office") (DUSF ¶5; NYSCEF 524).

In September 2022, GBI and NF Dynasty assigned their Class A Units to the Company, which the Company purported to reject (PSUF ¶66). Mr. Nicklaus retained his Class C Unit,

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 10 of 35**

10 of 35

which did not entitle him to a board vote but which, as noted above, gave him certain consent rights under the LLC Agreement to restrict the use of his name by the Company.

In this action, the Company alleges that Mr. Nicklaus has engaged in activities that breached obligations under the Purchase and Sale Agreement, the LLC Agreement, EGC Agreement, and the Non-Competition Agreement, and caused the Company substantial damage. Among other things, the Company alleges that Mr. Nicklaus has operated out of the Nicklaus Family Office to pursue deals for commercial endorsements and other exploitation of the Nicklaus IP without the consent, review or approval of Nicklaus Companies (NYSCEF 376 [Second Amended Complaint ("SAC")] ¶¶96-129).

On July 15, 2022, counsel for the Company sent a cease-and-desist letter to Mr. Nicklaus, demanding that he cease engaging in "activities in violation of the Company's rights, including soliciting business and marketing services related to golf course design and management …." (NYSCEF 22). The parties sharply disagreed on whether and to what extent Mr. Nicklaus had a legal right to engage in golf course design and related businesses that compete with the Company. Ultimately, litigation and arbitration ensued.

### Procedural Background

On May 3, 2022, Mr. Nicklaus and a longtime business associate commenced an arbitration proceeding in Florida against the Company under Mr. Nicklaus's Employment Agreement titled *Jack W. Nicklaus and W. Scott Tolley v. Nicklaus Companies*, LLC AAA Case No. 01-22-0001-8236 (the "Florida Arbitration") (DSUF ¶7).

Ten days later, on May 13, 2022, the Company commenced this action alleging breaches of the Purchase and Sale Agreement and LLC Agreement, tortious interference, and breaches of fiduciary duties (NYSCEF 1). Defendants moved to compel arbitration of the Company's

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 11 of 35**

11 of 35

claims, citing the Florida Arbitration (Mot. Seq. 001). The Company opposed that motion and filed a motion seeking temporary and preliminary relief enjoining Defendants from, among other things, working with any competitors or soliciting employees or customers of the Company (Mot. Seq. 003). After a hearing on August 9, 2022, the Court denied the temporary relief sought and set a briefing schedule on the preliminary injunction motion and directed the parties to engage in targeted discovery (NYSCEF 51, 53). Both motions were set for a hearing date of September 30, 2022.

On August 22, 2022, the Company filed an Amended Complaint alleging a breach of the Non-Competition Agreement (NYSCEF 54). In September 2022, Defendants filed a renewed motion to compel arbitration (Mot. Seq. 004).

On September 30, 2022, the Court denied Defendants' renewed motion to compel arbitration (NYSCEF 238), holding that: "[T]he arbitration pending in Florida will resolve whether, and to what extent, and for how long any restraints contained in the Employment Agreement inhibit Mr. Nicklaus' activities or GBI's activities for that matter. It does not address, in my view, whether and to what extent Mr. Nicklaus' activities are independently constrained by the terms of the other three agreements [The Non-Competition Agreement, the LLC Agreement, and Purchase and Sale Agreement]" (NYSCEF 239 ["Sept. 30, 2022 Tr"] at 56:14-20). The hearing on the preliminary injunction was continued to November 22 and 23, 2022.[1]

At the conclusion of the preliminary injunction hearing, the Court announced a "mixed result" (NYCSEF 246 ["11.22 Tr."] at 340). It determined, first, that the Company had not demonstrated a likelihood of success that the time-limited competitive restrictions contained in

---

[1] Defendants' motion to dismiss based on *forum non conveniens* (Mot. Seq. 005) was also heard on November 23, 2022, and was thereafter denied (NYSCEF 240).

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

Page 12 of 35

12 of 35

the parties' agreements (principally the Non-Competition Agreement) remained in effect after Mr. Nicklaus resigned from the Company and relinquished his membership interests entitling him to board seats (*id*. at 340, 342-46). However, noting that it was "not making a final finding on the merits, this isn't a trial" (*id*. at 349), the Court found that the Company had demonstrated a likelihood of success on its assertion that it had acquired for fair consideration all intellectual property necessary to conduct the Business, including the exclusive right to use Mr. Nicklaus' name, image, and likeness (*id*. at 349). In reaching that conclusion, the Court relied upon evidence (including correspondence with customers) suggesting that GBI had the exclusive right to license Mr. Nicklaus's personal name and likeness rights (*id*.) In sum, the Court concluded that "the most reasonable way to approach this motion is holistically. That the competitive [restraints] on Mr. Nicklaus, I think there is a strong argument they have expired. The intellectual property rights, there is a strong, equally strong argument they have not expired. Therefore, to try to harmonize this entire relationship, it seems to me that is the right result. That Mr. Nicklaus can compete pending a trial … [b]ut … it would not be equitable to just allow unbounded competition, completely ignoring the fact that the Nicklaus Companies acquired [for] substantial consideration, among other things, intellectual property rights that are not inextricably tied to the noncompetition agreement" (*id*. at 349-50).

On December 9, 2022, after considering proposed orders submitted by the parties, the Court granted the Company's motion for preliminary injunction "solely to the extent that during the pendency of this action, and subject to further order of the Court, Defendants GBI Investors, Inc. ("GBI") and Jack W. Nicklaus ("Mr. Nicklaus") along with their officers, directors, agents, shareholders, successors, employees, representatives, heirs, attorneys, and all other persons who are in active concert or participation with any of them, are enjoined from: (i) using or authorizing

**656284/2022 NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL
Motion No. 010 011**

**Page 13 of 35**

13 of 35

the use of Transferred Intellectual Property as defined in Section 4.10(a) of the Purchase and Sale Agreement ("PSA" [NSYCEF 113]), including Schedule 4.10(a) thereto, without the Company's prior written consent; and (ii) licensing Mr. Nicklaus's name, image, and likeness for commercial endorsements without the Company's prior written consent; provided, however, that nothing in this paragraph shall restrain Defendants from using or authorizing the use of Mr. Nicklaus's name, image, and likeness to identify Mr. Nicklaus as a professional golfer, or for other personal, investment, and charitable purposes" (NYSCEF 247 ["PI Order"]). The remainder of the Company's motion was denied "to the extent that it sought to enforce against Defendants any non-compete and non-solicitation provisions contained in the PSA, the Amended and Restated Limited Liability Company Agreement (NYSCEF 114) and Non-Competition Agreement (NYSCEF 115); for the avoidance of doubt, Defendants are free from contractual restrictions on competition and solicitation with respect to the Company other than the restrictions contained in the immediately preceding paragraph of this Order" (*id.*).

In accordance with the Court's Order, the Company posted a bond in the amount of one million dollars (NYSCEF 287, 288).

On April 18, 2023, the Court entered an order dismissing the Company's claims for breach of the LLC Agreement, tortious interference, breach of fiduciary duty, and for breach of the Purchase and Sale Agreement to the extent that it relied on the implied covenant of good faith and fair dealing (NYSCEF 310).

On November 6, 2023, the Court entered a Decision and Order denying Defendants' motion to vacate the Preliminary Injunction Order entered by the Court on December 9, 2022 (NYSCEF 346). Defendants sought vacatur primarily based on a newly "uncovered" 1994 document – in which Mr. Nicklaus "consented" to GBI using his name and likeness – to suggest

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 14 of 35**

14 of 35

that GBI did not have the authority to grant the Company exclusive rights to Mr. Nicklaus's name, image, and likeness in 2007. The Court found that the documents advanced by Defendants were not "new" evidence, and that Defendants did not establish a change in circumstances that rendered the continued enforcement of the preliminary injunction inappropriate (*id.*). The Court further noted that "[t]he documents upon which Defendants rely in support of this motion may be relevant to the ultimate determination of the parties' respective rights and obligations with respect to name, image, and likeness and other intellectual property rights. They are not, however, conclusive and do not undermine the Court's determination that preliminary injunctive relief was (and is) appropriate based on the record that has been presented thus far. Defendants will have the opportunity to convince the Court otherwise based on a full record at trial (or on summary judgment)" (*id.*).

On March 4, 2024, the Company filed a Second Amended Complaint asserting claims for breach of the Purchase and Sale Agreement (Count III), breach of the LLC Agreement (Counts I-II), breach of alleged fiduciary duties (Counts IV-V), and breach of the Non-Competition Agreement (Count VI) (SAC).

Note of Issue was filed on April 26, 2024 (NYSCEF 382). The parties thereafter filed the presently pending motions for summary judgment (Mot. Seq. 010 and 011).

On July 2, 2024, the Arbitrator in the Florida Arbitration entered an Interim Award which, among other things, granted "Mr. Nicklaus' claim for declaratory relief and declares that under Mr. Nicklaus' Employment Agreement, as amended, his post-termination restrictive covenant period began to run on June 1, 2017 and ended on June 1, 2022. Mr. Nicklaus did not act inconsistently with his post-termination covenants while they were in effect. He has the right to lend his personal endorsement to, or provide services as an endorsement spokesperson for any

**656284/2022 NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No. 010 011**

**Page 15 of 35**

product, service or person. Since Mr. Nicklaus' post-termination covenants have expired, he is now free to engage in the activities listed in Employment Agreement §§ 5.2 and 5.3. For clarity, this includes the design of golf courses, commercial endorsements, and the solicitation of customers and employees of the Company and its Affiliates" (NYSCEF 577 at 76). The Arbitrator also noted that "[w]hether any other agreements outside the purview of those before this Tribunal may restrict his abilities to do any of the foregoing is not for this Arbitrator to decide" (*id.* at 34).[2] An Order and Final Judgment in the Florida Arbitration was entered by the Florida Circuit Court for Miami-Dade County on December 19, 2024 (NYSCEF 591-593).

## DISCUSSION

A motion for summary judgment should be granted if "upon all the papers and proof submitted," a claim or defense is sufficiently established "to warrant the court as a matter of law"

---

[2] The Arbitrator added a footnote, perhaps for this Court's consumption, stating his view that: "Notwithstanding the foregoing, to the extent the Company attempts to argue in another forum that other agreements prevent Jack Nicklaus from acting as a golf course designer or consultant or lending his personal endorsement to, or providing services as an endorsement spokesman for, any product, service or Person (which would logically include using his name and image), such efforts would circumvent this Tribunal's decision and be an attempt to implement an unlawful and indefinite non-compete provision which would prevent Mr. Nicklaus from earning a livelihood. It is undisputed that the Employment Agreement's restrictive covenant provisions were "a critical part" of the overall deal. Resp. Post-Hrg. Br. at 1, 3, 10, 22. They gave the Company significant rights, and they also gave Mr. Nicklaus rights. He bargained for the ability to end his Employment Term after five years and then compete with the Company five years after that. The plain language of the EA compels the conclusion that when the restrictive covenants expired, he would be free to engage in the restricted activities on his own and in his own name. Otherwise, the covenants would be either illusory and effectively be made permanent, as one cannot serve as a designer of record or endorser without the use of one's name and related publicity rights" (NYSCEF 577 at 34 n10). The Court has considered the Arbitrator's thoughtful analysis, but it does not agree with the suggestion that a contrary decision – if based on different agreements – would have "circumvented" the arbitration award. The Court has decided this case based on the extensive record presented in this litigation, which focuses on a number of agreements (some containing distinct restraints on competition by Mr. Nicklaus and/or GBI) that were not subject to arbitration.

**656284/2022 NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No. 010 011**

**Page 16 of 35**

16 of 35

to direct judgment in favor of the moving party (CPLR 3212[b]). "The proponent of a summary judgment motion must make a *prima facie* showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Silverman v Perlbinder*, 307 AD2d 230, 230 [1st Dept 2003]). Once the moving party meets this burden, "the burden then shifts to the nonmoving party to establish the existence of material issues of fact which require a trial of the action" (*Jacobsen v New York City Health & Hosps. Corp.*, 22 NY3d 824, 833 [2014]). The party opposing a motion for summary judgment must "produce evidentiary proof in admissible form" (*Stonehill Cap. Mgmt., LLC v Bank of the West*, 28 NY3d 439, 448 [2016]). Mere conclusions, expressions of hope, allegations or assertions are insufficient to raise a triable issue of fact (*Zuckerman v City of N.Y.*, 49 NY2d 557, 562 [1980]).

"[A]greements executed at substantially the same time and related to the same subject matter are regarded as contemporaneous writings and must be read together as one" (*1471 Second Corp. v NAT of NY Corp.*, 162 AD3d 449, 450 [1st Dept 2018]; *see also Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, N.A. v Nomura Credit & Capital, Inc.*, 30 NY3d 572, 581 [2017] ["a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect'"]). Accordingly, in analyzing the parties' contractual rights and obligations, the Court has endeavored to read the May 2007 Transaction Documents—the PSA, LLC Agreement, the Amendment and Reimbursement Agreement, Employment Agreement, and Non-Competition

**656284/2022  NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 17 of 35**

17 of 35

Agreement, as augmented by the EGC Agreement—as part of a single, overarching agreement, harmonizing inconsistencies whenever possible to avoid rendering any provision meaningless.[3]

## I.    Third Cause of Action for Breach of the PSA (Against GBI)

As described above, in granting in part the Company's motion for a preliminary injunction the Court found that the Company had demonstrated a likelihood of success of its claim that it owns all intellectual property necessary to conduct the Business, including exclusive rights to Mr. Nicklaus' name, image, and likeness for commercial purposes that bound Mr. Nicklaus himself (NYCSEF 246 at 349).  This finding was based on the premise – supported by certain customer correspondence introduced at the preliminary injunction hearing – that GBI had the legal right to convey such exclusive rights to the Company via the PSA.

The parties have now submitted their positions based on a full evidentiary record in their respective summary judgment motions and have taken the position that trial is not required on the Company's claim for breach of the PSA (NYSCEF 590 [11.25.24 Tr] at 84:22-25 to 85:1-7). Thus the Court can now determine whether GBI did, as a matter of law, have the authority to convey to the Company rights to Mr. Nicklaus's name, image and likeness that are exclusive even as against Mr. Nicklaus himself, which would in effect constitute a permanent non-compete agreement precluding Mr. Nicklaus from using his name, image and likeness to sell or endorse products or services similar to those sold or endorsed by the Company.  Based on that

---

[3] There has never been a clear explanation for why the parties chose to document the in multiple contemporaneous agreements covering overlapping rights and obligations but with different governing law, forum selection, and contracting parties and minimal effort at cross-referencing. The summary judgment record is notably devoid of meaningful contemporaneous evidence of communications among the parties or counsel during the drafting and negotiation of the agreements to explain, for example, why or how they envisioned the agreements fitting together.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 18 of 35**

18 of 35

[* 18]

evidentiary record, the Court finds that the Company has not demonstrated GBI had such authority, and accordingly its claim for breach of the PSA must be dismissed.

Under Florida Law, which governs Mr. Nicklaus's publicity rights, "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by: . . . Any other person, firm or corporation authorized in writing by such person to license the commercial use of her or his name or likeness" (Fla Stat Ann § 540.08 [a][b]).  Consistent with that statute, courts have found that a written assignment, sale, or license of one's rights of publicity must be unambiguous (*see e.g.*, *Traeger Pellet Grills LLC v Traeger*, 2019 WL 4305502, at *6 [MD Fla Sept. 11, 2019] ["Based upon a review of the agreements, the Court finds that the contractual terms fail to *unambiguously* provide for an assignment of the Defendants' rights of publicity to Traeger Grills."] [emphasis in original]).

New York law, which governs the PSA, is similar (*see Madrigal Audio Labs., Inc. v Cello, Ltd.* (799 F2d 814, 822 [2d Cir 1986] [although a person can sell the right to use his name, "a court will not bar him from using that name unless his intention to convey an exclusive right *to the use of [his] own name* is *clearly shown*."] [emphasis added]; *JBCHoldings NY, LLC v Pakter*, 931 F Supp 2d 514, 530 [SDNY 2013] ["The vague terms of the APA seem highly unlikely to meet the bar set by the Second Circuit for proving that a contract conveyed away from an individual the exclusive right to use her name"]; *see also Poorman v Julian*, 160 NE2d 169, 172 [Ill App Ct 1959] ["The right to the use of a name in connection with a business may be a valuable one but a court of equity will enjoin the use by a natural person of his own name only when there is a grant to someone else of the exclusive right to use it. This exclusive right must be

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 19 of 35**

19 of 35

found in the final agreement of the parties by the use of the word 'exclusive' or the intent of the parties to grant an exclusive right must be manifest"]).[4]

As an initial matter, there is no dispute that GBI transferred to the Company via the PSA the Intellectual Property the Company needed to continue GBI's business of designing golf courses, licensing trademarks, and manufacturing and distributing golf equipment if it so chooses. (Mr. Nicklaus does not seek to enjoin the Company from continuing to pursue its business or from using the Nicklaus-related trademarks that were conveyed in the PSA.) The question, instead, is whether that conveyance of rights in the PSA precludes *Mr. Nicklaus* from using his own name (aside from the transferred trademarks) commercially to design golf courses, personally endorse products (which the Company cannot do without Mr. Nicklaus's personal involvement in any event) and the like, putting aside for now the separate restrictions contained in the Non-Competition Agreement which is the subject of the Company's Sixth Cause of Action (discussed *infra*). It did not.

The PSA provides that the Company received the commercial and publicity rights held by GBI. PSA § 4.19 states that the Company is acquiring "all assets, rights and properties necessary to conduct the Business in substantially the same manner as such Business is conducted by GBI and its Subsidiaries immediately prior thereto." (PSA § 4.19). As Defendants point out, the Company did not need Mr. Nicklaus' publicity rights to operate the business but

---

[4] In *JA Apparel Corp. v Abboud* (568 F3d 390 [2d Cir 2009]), which involved facts similar to this case, held that the applicable contract language, including conveyance of trademarks containing the Abboud name, did not unambiguously provide that Mr. Abboud had agreed to sell exclusive rights to use his name for all commercial (i.e., non-trademark) purposes. The court remanded for further proceedings to consider extrinsic evidence. As noted above, the parties in this case have not identified extrinsic evidence – such as meaningful contemporaneous drafting history and communications – that would warrant a trial on this question.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 20 of 35**

20 of 35

rather his *personal* services, which it secured through the Employment Agreement (NYSCEF 461 at 7).

The Company claims the rights held by GBI "'include[d] all … interests' in those rights previously held by Mr. Nicklaus." However, Section 4.19 simply confirmed that the transfer would include "all assets or interests … heretofore held by a member of the Nicklaus Family" in "any business conducted by, or asset held by, GBI" (PSA § 4.19). This language and the referenced Schedule 4.19 focuses on ownership interests in various entities, and does not unambiguously (let alone perpetually and exclusively) convey Mr. Nicklaus's name, image, and likeness rights that are his personal intellectual property.

The PSA explicitly lists all the assets transferred to the Company:

> All of the intangible rights and property of GBI, including all of the publicity and related commercial rights **held by GBI to use and/or license** the use of the endorsement, name, nickname, likeness, signature and/or other identifying characteristics of Jack W. Nicklaus and biographical information related to his career, all Intellectual Property owned by or licensed to GBI, and all related rights as a licensor of such Intellectual Property (other than the Excluded Intellectual Property), going concern value, goodwill, telephone, telecopy and e-mail addresses and listings.

(PSA, Annex A ¶ 15 [emphasis added]). PSA Schedule 4.10(b) provides:

> For the avoidance of doubt, the right of Jack W. Nicklaus to utilize his endorsement, name, nickname (the "Golden Bear"), likeness, signature and biographical information to identify himself as a professional golfer and for personal, investment and charitable purposes is not an asset of GBI and continues to be retained by Mr. Nicklaus individually.

(PSA, Schedule 4.10(b)).

In short, the Company only acquired the rights that GBI held, which are not expressly defined in the PSA. Furthermore, the PSA makes clear that whatever rights GBI held, those rights did not include "the right of Jack W. Nicklaus to utilize his endorsement, name, nickname

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 21 of 35**

21 of 35

(the "Golden Bear"), likeness, signature and biographical information to identify himself as a professional golfer and for personal, investment and charitable purposes." Notably, Annex A of the PSA does not use the word "exclusive" in describing the rights "held by GBI" to use and/or license Mr. Nicklaus' endorsement, name, etc. Nor does it use the word "own" in describing such rights, as it does for "Intellectual Property."

Nor does the LLC Agreement shed any light on the question, at least not in a way that is helpful to the Company. That agreement does not, as the Company suggests, "unambiguously recognize[] the Company's ownership of Mr. Nicklaus' publicity rights" (NYSCEF 515 at 15). Section 6.3, on which the Company relies, provides that "for so long as the Class C Unit is outstanding, neither the Company nor any of its Subsidiaries shall, and none of the Board, any Subsidiary, any Officer nor any other Person shall have the authority to cause or permit the Company, any Subsidiaries or any other Person to, use, exploit, license, assign, sell or otherwise transfer the Nicklaus IP in any manner without the prior consent of the Class C Member, which consent will not be unreasonably withheld . . ." (*id.* §6.3). The agreement defines "Nicklaus IP" to mean the "name, photograph, likeness and image of JWN and the JWN-related brands and trademarks now existing or owned by or licensed to the Company in the future" (*id.* at 13). Thus, this definition includes items which were retained by Mr. Nicklaus individually—his "name, photograph, likeness and image"—as well as the trademarks the Company owned, as the Company had a right to use and license Mr. Nicklaus' name, photograph, likeness, and image during this Employment Term, subject to his approval (Employment Agreement § 2.1[b]). Nothing in Section 6.3 or the Definitional section states that the Company *owns* Mr. Nicklaus's publicity rights outright.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 22 of 35**

Nor can the LLC Agreement, when read in combination with the contemporaneous Employment Agreement and Non-Competition Agreement, reasonably be read to convey Mr. Nicklaus's personal name, image, and likeness rights in a way that would be the equivalent of a perpetual non-competition agreement. First, the Non-Competition Agreement has a comprehensive list of activities Mr. Nicklaus may not engage in with a competitor of the Company during a carefully defined Restricted Period (NYSCEF 402 § 1). Among the restricted activities are the commercial use of Mr. Nicklaus's "name or likeness" for the business of a competitor (*id.*). If Mr. Nicklaus had already conveyed those rights exclusively to the Company in perpetuity, there would be no need to restrain his ability to use what he does not have (*see Rauch Indus., Inc. v. Radko*, 2022 WL 769385 [SDNY 2022] [rejecting plaintiff's argument that a pair of purchase agreements restricted defendant's ability, indefinitely, to use his name commercially because, among other things, plaintiff could not explain the purpose of restrictive covenants in a separate agreement if, as plaintiff contended, the purchase agreements already restricted defendant's ability to use his name commercially]).

Likewise, the Employment Agreement barred Mr. Nicklaus from designing golf courses or endorsing products and services outside of the Company during his Employment Term and for five years thereafter. As the Florida Arbitrator noted: "the Employment Agreement's restrictive covenant provisions were 'a critical part' of the overall deal…. The plain language of the [Employment Agreement] compels the conclusion that when the restrictive covenants expired, [Mr. Nicklaus] would be free to engage in the restricted activities on his own and in his own name. Otherwise, the covenants would be either illusory [or] effectively be made permanent, as one cannot serve as a designer of record or endorser *without* the use of one's name and related publicity rights" (NYSCEF 593 at 34 n10). Indeed, a judgment depriving Mr. Nicklaus of the

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 23 of 35**

ability to use his name and related publicity rights in commerce would effectively render the restrictive covenants in both the Employment Agreement and Non-Competition Agreement meaningless (*see Nomura*, 30 NY3d at 581 ["a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect'"]).  In the absence of clear evidence indicating an intention to convey Mr. Nicklaus's personal name, image, and likeness rights exclusively and perpetually to the Company, even to the exclusion of his own use of those rights, implying such a restraint is unwarranted.

Significantly, none of the prior agreements or filings cited by the Company in its summary judgment papers demonstrate that GBI owned a right to Nicklaus' name, image or likeness that was exclusive *even as against Nicklaus himself*.  First, the 1994 Consent given to GBI by Mr. Nicklaus simply states "I, Jack Nicklaus . . . hereby consent to the use and registration of my name, likeness, signature, and all nicknames associated with me, including "Golden Bear", by Golden Bear International, Inc., a Florida corporation, for all of the goods and services with which said corporation, its assigns or successors now or hereafter uses such name, likeness, signature and/or nicknames" (NYSCEF 474).  This is not a sale or transfer.  Nor does the 1994 Consent contain any language of exclusivity or irrevocability.

The Company also cites to certain SEC filings (and attachments thereto) to argue that GBI had exclusive rights to Nicklaus' name, image and likeness.  The SEC filings incorporate certain agreements including a 1996 Trademark License Agreement between GBI and GBG, and a Personal Service Agreement, among others.  The Company argues that the 1996 Trademark Agreement, which stated GBI had "exclusive ownership" of publicity rights, was incorporated into the SEC filings which were signed under penalty of perjury.  The SEC filing states:

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 24 of 35**

24 of 35

[* 24]

> Pursuant to a Trademark License Agreement, GBI has granted to the Company a royalty-free, exclusive right (subject to the exceptions described below) to *utilize and sublicense* all major trademarks, tradenames and service marks owned or developed by GBI, including the GOLDEN BEAR, NICKLAUS and JACK NICKLAUS trademarks (collectively, the "Licensed Marks") in any jurisdiction worldwide in which GBI has trademark rights, and the right, subject to the approval of GBI which shall not be unreasonably withheld . . . GBI also granted to the Company the *right to use* the name, likeness, nickname, biographical data and other identifying characteristics of Mr. Nicklaus *in connection with the advertising, promotion, sale or rendering of the Company's products or services throughout the world*."

(NYSCEF 476 at p 60 [emphasis added]).  The Personal Services Management Agreement was also incorporated into the SEC Filings and that agreement stated that Nicklaus has reserved the right to enter any service contract in his own name or any other names designated by him (NYSCEF 476 at p 62).

These filings do not demonstrate that GBI owned a perpetual right to Mr. Nicklaus's name, image and likeness that is exclusive even as against Mr. Nicklaus himself.  Instead, they demonstrate that GBI was the exclusive *vehicle* through which Mr. Nicklaus was licensing his trademark and publicity rights.  The record contains no definitive agreement(s) under which Mr. Nicklaus unequivocally granted or relinquished his rights (even as against himself) to GBI.  Accordingly, GBI could not grant such rights to the Company in the PSA.  The upshot is that the competitive restrictions on Mr. Nicklaus personally are limited to those contained in agreements to which he was a party – mainly, the Non-Competition Agreement and the Employment Agreement.[5]

---

[5] The Company argues that when the negotiations for the May 2007 Transaction began, Mr. Nicklaus's and GBI's authorized agent prepared a Preliminary Term Sheet providing that the proposed sale of GBI's business would give the Company "a perpetual license to use [Mr. Nicklaus's] name, likeness, and image in the conduct of its business, subject only to the foregoing veto rights and other personal uses expressly reserved during his lifetime" (NYSCEF

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**          **Page 25 of 35**
  **Motion No.  010 011**

[* 25]

25 of 35

Moreover, the Company has acknowledged that Mr. Nicklaus historically made paid appearances outside of GBI and the Company, in which he would grant third parties the right to use his name, image, and likeness in commerce (NYSCEF 448, No. 7-8). These included the 2004 Golf Solutions Endorsements Agreement and the Electronic Arts License and Celebrity Agreement, both of which provide that Mr. Nicklaus had the full right and legal authority to license the use of his publicity rights (NYSCEF 395, 396). While the Company argues that these consents could have been given by Mr. Nicklaus in his capacity as president of GBI, not his individual capacity, the agreements provide otherwise. For instance, the Endorsement Agreement provides: "*Nicklaus* has the right to authorize the use of his name, likeness, voice and statements, and biographical and historical information regarding his career as a professional golfer (collectively, the "Endorsement") for the purposes of endorsing the marketing, distribution, and sale of products developed and sold by third parties. *Nicklaus has retained GBG as his representative* for the purpose of arranging suitable endorsement relationships and acting as Nicklaus' liaison to his endorsement clients." (NYSCEF 395 at 1 [emphasis added]). The Agreement clearly distinguishes between Mr. Nicklaus in his personal capacity and GBG. The Celebrity Agreement is clearly directed to Mr. Nicklaus personally: "Dear Mr. Nicklaus, This letter will set forth the agreement between Electronic Arts Inc. ("EA") and you regarding the use of your name and likeness in EA' s interactive golf software products . . ." (NYSCEF 396 at 1). The Celebrity Agreement was directed to the head of GBI's marketing subsidiary, Andy O'Brien, as agent, but is signed by "Jack Nicklaus" not GBI.

---

488 at 97970). This proposal, which notably carried a proposed purchase price more than double the $145 million to which the parties ultimately agreed, does not reflect the final terms of the PSA and thus has little or no probative value.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 26 of 35**

26 of 35

[* 26]

In sum, had the parties to the May 2007 Transaction intended for there to be a transfer of exclusive ownership of Mr. Nicklaus' publicity rights to the Company, exclusive even as against Mr. Nicklaus himself, "they easily could have included a provision to that effect" (*Schron v Troutman Sanders LLP*, 20 NY3d 430, 437 [2013]). The parties did not do that here. And, to borrow the Second Circuit's words in a factually similar case, "the fact that [the Company] paid a large price for the [Nicklaus] brand (and existing licensing agreements) does not necessarily mean that [the Company] purchased the right to prohibit [Mr. Nicklaus] from using his name to refer to himself in a non-trademark sense" (*JA Apparel*, 568 F.3d at 398).

In this case, the summary judgment record does not support the Company's contention that the PSA prohibits Mr. Nicklaus (through GBI, which signed the PSA) from using his own name commercially. Any such restriction must be found in the Employment Agreement (which is not before the Court and has been found in arbitration to be terminated as of June 1, 2022) or the Non-Competition Agreement (which is discussed below). Accordingly, summary judgment is **granted** in favor of GBI on the Company's claim for breach of the PSA.

## II.     Sixth Cause of Action for Breach of the Non-Compete (Against Nicklaus)

Defendants' motion for summary judgment dismissing the sixth cause of action is granted, and the Company's motion for judgment in its favor is denied.

The Company alleges that Mr. Nicklaus breached the Non-Competition Agreement by competing with the Company and soliciting customers. The Non-Competition Agreement provides that "[f]or so long as GBI retains ownership interest in the Company sufficient to elect a least two (2) members of the Board of Managers, but in no event for a period of less than ten (10) years after the date of the Closing (the "Restricted Period"), [Mr. Nicklaus] will not, without the prior written approval of" the Board "directly or indirectly (i) participate as an owner of more

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 27 of 35**

27 of 35

than five percent (5%) of the equity in any business which is a Competitor . . .(ii) act as a principal of, engage in any other substantial professional employment with, provide business consulting activities to, any such Competitor, or (iii) provide my personal services as spokesman or authorize the promotional use of my name or likeness for the business, products or services of a Competitor…." (NYSCEF 402 at § 1). The Agreement further restricts Mr. Nicklaus from soliciting Company employees "to terminate their employment" (*id.* § 2). The term "Competitor" was defined as "a business or entity which competes with the Company… by offering substantially similar goods or services to similarly situated customers" (*id.* § 3[b]).

Defendants argue that Mr. Nicklaus "began preparing to compete with the Company," but did not engage in any restricted activities before GBI relinquished its Class A Units in the Company on September 1, 2022, which terminated the Restricted Period under the Non-Competition Agreement (NYSCEF 459 at 9-10; DUSF ¶160). Although the SAC includes allegations regarding certain proposed business arrangements purportedly pursued by Mr. Nicklaus prior to that date, the Company has not presented evidence in the summary judgment record to demonstrate that such "preparation" breached the agreement or caused harm to the Company giving rise to a viable cause of action for breach of contract. [6] Indeed, the Company does not address the request for summary judgment as to the period before September 1, 2022 in its briefing in opposition to Defendants' motion (*see* NYSCEF 515 at 30-33), or on its own motion for summary judgment (*see* NYSCEF 463 at 25-27; NYSCEF 578 at 16-19). Thus, the

---

[6] In the response to Defendants' Rule 19a Statement, the Company asserts that Mr. Nicklaus attempted to use the Nicklaus name without authorization, and that there is evidence showing that the "Nicklaus Family" "was considering competing against the Company as early as 2018" (NYSCEF 516 ¶160 [Company's response]). Again, this is insufficient to support a viable cause of action for breach of contract.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 28 of 35**

[* 28]

28 of 35

Company has not raised an issue of fact that would preclude summary judgment in favor of Defendants with respect to that period of time. Accordingly, the Court will focus on the question raised and actively contested by the Company—that is, whether Mr. Nicklaus breached the contract after September 1, 2022 and, perhaps more importantly, whether he should be enjoined from doing so going forward.

On September 1, 2022, counsel for Defendants sent the Company two documents assigning the Class A Units from GBI and NF Dynasty, Inc. to the Company. Section 7.1(a) of the LLC Agreement, titled "Transfers", provides that (a) that "subject to Sections 7.2 and 7.5, the following Transfers are permitted without the consent of the Board: (i) any Transfer of Interests to the Company" (LLC Agreement § 7.1[a]). Section 7.2, titled "Further Restrictions," provides that: "[n]otwithstanding any contrary provision in this Agreement, any otherwise permitted Transfer to any Person shall be null and void if … (viii) the Company does not receive written instruments (including copies of any instruments of Transfer and such Assignee's consent to be bound by this Agreement as an Assignee and, if applicable, the Members Agreement) that are in a form reasonably satisfactory to the Board (in its sole and absolute discretion)" (*id.* § 7.2[viii]).

The Company argues that because Section 7.2(viii) states that "Assignee's consent to be bound by this [LLC] Agreement" must be provided, that means the Board had to consent to the transfer of membership interests to the Company itself. In context, however, this argument makes no sense. The concern in Section 7.2(viii) plainly is to ensure that a *new* Member has adequately indicated its consent to be bound by the LLC Agreement before the assignment may be deemed effective. That concern has no applicability when the Assignee is the Company itself. Since Section 7.1(a) makes abundantly clear that Board consent is not required for transfers *to the Company*, this is not an instance in which the Company's consent is required.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 29 of 35**

29 of 35

The same analysis applies to Section 9.3 of the LLC Agreement, which provides that "[n]o party to this Agreement may assign the Agreement, or any of its rights or obligations hereunder, without the prior written consent of the other parties hereto which consent may be withheld in the sole discretion of the party from whom consent is sought." (*id.*§ 9.3). Reading the relevant paragraphs, it is clear that consent was required for assignments or transfers to *third parties* (which would require the remaining members to conduct business with such new parties), not to transfers of membership interests to the Company itself which are, as noted above, permitted by Section 7.1(a). Furthermore, Sections 7.4 and 7.6, which apply to withdrawals and substitute members, does not apply because the Company, as the assignee, could not be considered to be a Substitute Member in itself.

The Company's citation to Delaware Law does not change this outcome. Delaware law states that: "*Unless otherwise provided in the limited liability company agreement*, a limited liability company may acquire, by purchase, redemption or otherwise, any limited liability company interest or other interest of a member or manager in the limited liability company …, [and] any such interest so acquired by the limited liability company shall be deemed canceled" (6 Del. C. § 18-702(e) [emphasis added]). Here, the LLC Agreement does "otherwise provide." Therefore, the language of the LLC Agreement controls.

In sum, as of September 1, 2022, GBI no longer retained an ownership interest in the Company sufficient to elect a least two members of the Board of Managers. As a result, the Restricted Period defined in the Non-Competition Agreement expired as of that date. Accordingly, Mr. Nicklaus's motion to dismiss the Company's Sixth Cause of Action for breach of the Non-Competition Agreement is **granted**, and the Company's Motion for summary judgment is **denied**.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
  **Motion No.  010 011**

**Page 30 of 35**

30 of 35

### III. First Cause of Action for Breach of LLC Agreement (Against Nicklaus) & Fourth Cause of Action for Breach of Fiduciary Duties (Against Nicklaus).

Defendants' motion for summary judgment on the First and Fourth causes of action is granted. In the first cause of action, the Company alleges that Mr. Nicklaus breached §§ 9.8, 1.4, and 6.3 of the LLC Agreement by "failing to inform the Company of business opportunities, negotiating and exploring business opportunities without the involvement of the Company, failing to honor commitments and purporting to revoke and terminate the Consent and other consents given by Mr. Nicklaus" and breached the EGC Agreement's amendment of the LLC Agreement (SAC ¶ 165). The fourth cause of action for breach of fiduciary duty is similar and adds allegations that "Mr. Nicklaus breached his fiduciary duties to the Company by engaging in bad faith acts against the best interests of the Company, including unauthorized exploitation of the Nicklaus IP and acts in derogation of the Company's rights" (SAC ¶ 188).

However, nothing in §§ 9.8, 1.4, and 6.3 of the LLC Agreement[7] or the EGC Agreement (even assuming it is applicable here)[8] conveys a right to the Company to be informed of Mr.

---

[7] Section 1.4 is a definitional provision which created no obligations that can be breached. It simply identified the Company's four principal business activities as of May 2007 (LLC Agreement§ 1.4). Section 6.3, in turn, identifies Mr. Nicklaus' rights as a Class C Member of the Company. It specifies that the Company may not use, license, or transfer what is defined as the Nicklaus IP without first making a "written request" to Mr. Nicklaus and obtaining his "prior consent" – which may not be "unreasonably withheld." (*id.* § 6.3). Section 9.8, titled "Further Assurances" provides that "[e]ach of the parties hereto does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other instruments, documents and statements, and to take such other action as may be required by law or reasonably necessary to effectively carry out the purposes of this Agreement." (*id.* § 9.8).

[8] The Company's argument that the EGC Agreement's "Duties" provision modified the LLC Agreement is unavailing. The EGC does not state what agreements it is modifying and the Company itself alleges that the EGC amended the "LLC Agreement and other Transaction Agreements" (SAC ¶75). While it may be inferred that the EGC amends the LLC Agreement in

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 31 of 35**

[* 31]

31 of 35

Nicklaus's other business opportunities or requires Mr. Nicklaus to involve the Company in negotiating or exploring other business opportunities, particularly in light of Section 6.11, the "Other Activities" provision. That section expressly exempts the Company's Members and their Affiliates from liability for engaging in "other business venture[s] or activit[ies] of any nature and description," including "competitive venture[s] or activit[ies]." (LLC Agreement § 6.11). It specifically disclaims "[t]he legal doctrines of 'corporate opportunity,' 'business opportunity' and similar doctrines." (*id.*).

Furthermore, as discussed above, specific limitations on competition by Mr. Nicklaus are addressed by the Employment Agreement and Non-Competition Agreement, both of which have expired. Reading these contemporaneously negotiated agreements together, as we must, this general requirement to "inform" cannot reasonably be construed to countermand the far more specific provisions of agreements setting an expiration date on Mr. Nicklaus's competitive restrictions.

As to the Company's allegation that Mr. Nicklaus purported to revoke and terminate the Consent and other consents given by Mr. Nicklaus, this claim also fails. As described above, Section 6.3 of the LLC Agreement provides that the Company may not "use, exploit, license, assign, sell or otherwise transfer the Nicklaus IP in any manner without the prior consent of [Mr.

---

some fashion due to the "Governance" section which appoints new officers (of an unspecified company), the fact that the EGC Agreement provides that Mr. Nicklaus "shall at all times use his reasonable best efforts to advance the interests of the Company," cannot reasonably be construed to mean that it created an expansive new right or obligation under the LLC Agreement. In contrast, Defendants more convincingly argue that the "Duties" provision modified the Employment Agreement because (1) the provision references the Employment Agreement, and (2) when comparing the "Duties" provision in the Employment Agreement to the EGC's provision, it is clear that it is a modification of that section, given the similarity of the language.

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 32 of 35**

32 of 35

Nicklaus], which consent will not be unreasonably withheld" (LLC Agreement §6.3). Here, the Company does not allege that it ever made a written request that resulted in consent being unreasonably withheld. Moreover, the Company does not argue that the 1994 Consent was given pursuant to Section 6.3, rather the Company alleges that it effectively *acquired* the 1994 Consent in the May 2007 Transaction.[9] Even if that were the case, however, Section 6.3 is a later agreement separately requiring Mr. Nicklaus's specific consent with respect to future use of Nicklaus IP *by the Company*. The provision thus supersedes any previous consent given to GBI. In addition, Section 6.3 is a limit on what the *Company* can do, not a limit on what Mr. Nicklaus can do in his own business after separation from the Company. As such, it cannot give rise to an affirmative claim for breach of contract based on Mr. Nicklaus's commercial activities. Accordingly, the Company's claim for breach of the LLC Agreement must be dismissed.

The Company's contention that Mr. Nicklaus's post-employment conduct breached fiduciary duties he owed to the Company is also unavailing. Section 6.2(d) of the LLC Agreement states that: "No Board member (in each case in his or her capacity as such) shall owe any fiduciary duties to the Company." (LLC Agreement § 6.2(d)). The Company's attempt to evade that provision by referring to Mr. Nicklaus's duties as an Officer or Manager of the Company is unpersuasive. The SAC complains about conduct which post-dates Mr. Nicklaus' termination of his employment with the Company in June 2017. Mr. Nicklaus remained a minority Board member with the title of Co-Chairman after that date, but he was not an "officer"

---

[9] According to the Company, GBI effectively conveyed to the Company a "Consent" signed by Mr. Nicklaus, dated December 1, 1994, in which he stated that he "consent[s] to the use and registration of my name, likeness, signature, and all nicknames associated with me, including 'Golden Bear', by Golden Bear International, Inc., a Florida corporation, for all of the goods and services with which said corporation, its assigns or successors now or hereafter uses such name, likeness, signature and/or nicknames."

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 33 of 35**

of the Company or involved in "manag[ing]" its affairs.  His conduct during that period must be assessed against obligations he undertook under the Employment Agreement, Non-Competition Agreement, and the PSA, not by reference to fiduciary duties based on employment or management of the Company, which ceased in 2017.

Accordingly, Mr. Nicklaus' motion for summary judgment on dismissing claims against him for breach of the LLC Agreement and breach fiduciary duty is **granted**.

## IV.    Second Cause of Action for Breach of LLC Agreement (Against GBI) & Fifth Cause of Action for Breach of Fiduciary Duties (Against GBI).

Finally, the Company's claims against GBI for breach of the LLC Agreement (second cause of action) and breach of fiduciary duty (fifth cause of action) are dismissed.  The allegations against GBI are based on the same conduct alleged against Mr. Nicklaus (*see* SAC ¶ 173 [alleging that "GBI committed these breaches [of the LLC Agreement] by permitting Mr. Nicklaus, its officer and director and the GBI Designee on the Company's Board to engage in the above conduct [alleged against Mr. Nicklaus]"]; ¶ 196 ["GBI breached its fiduciary duties to the Company by permitting Mr. Nicklaus to act against the best interests of the Company"]).

As discussed above, the Company did not demonstrate that Mr. Nicklaus breached the LLC Agreement or breached any fiduciaries duties to the Company.  Thus, these allegations cannot support a breach of contract or breach of fiduciary duty claim against GBI based on Mr. Nicklaus' conduct.  Since the Company does not address any independent breaches by GBI in its papers, summary judgment in favor of GBI is **granted**.

\*    \*    \*    \*

Accordingly, it is

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**
**Motion No.  010 011**

**Page 34 of 35**

[* 34]

**ORDERED** that Defendants' Motion for Summary Judgment (Mot. Seq. 010) is **GRANTED** and the Second Amended Complaint is dismissed in its entirety, with costs and disbursements to Defendant as taxed by the Clerk upon the submission of an appropriate bill of costs; it is further

**ORDERED** that the Preliminary Injunction issued on December 9, 2022 (NYSCEF 247) is hereby dissolved and vacated; it is further

**ORDERED** that, if Defendants intend to seek compensation for identifiable damages arising from the now-dissolved Preliminary Injunction, the parties shall appear for a hearing on April 7, 2025 at 11:00 AM to address the disposition of the $1 million bond posted by the Company in connection with that injunction; in such case, the parties shall file letters no later than five (5) days prior to the hearing setting forth their positions; and it is further

**ORDERED** that Plaintiff's Motion for Summary Judgment (Mot. Seq. 011) is **DENIED**.

This constitutes the Decision and Order of the Court.

20250324163137JMCOHENA14A2669075D4781BC7F595B865C8E3D

| 3/24/2025 | | | JOEL M. COHEN, J.S.C. |
| --- | --- | --- | --- |
| DATE | | | |

| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | |
| --- | --- | --- | --- | --- | --- |
| | | GRANTED | DENIED | X GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

**656284/2022   NICKLAUS COMPANIES, LLC vs. GBI INVESTORS, INC. ET AL**          **Page 35 of 35**
**Motion No.  010 011**

35 of 35

[* 35]